NORMANOCH ASSOCIATION, INC., A CORPORATION, PLAIN-
TIFF-APPELLANT, v. PAUL BALDASANNO, DEFENDANT-
RESPONDENT.

Argued May 7 and 8, 1962—Decided May 6, 1963.

*Mr. Frank G. Schlosser* argued the cause for plaintiff-appellant.

*Mr. Martin J. Loftus* argued the cause for defendant-respondent.

The opinion of the court was delivered by

HANEMAN, J. This is an appeal by Normanoch Association, Inc. (Normanoch), from a judgment of the Superior Court, Chancery Division, which dismissed its complaint demanding injunctive relief and damages against Paul Baldasanno (Baldasanno) for alleged trespass upon certain lands underlying Culvers Lake in Sussex County, and which adjudged Baldasanno the owner of said lands. Decision in this matter was held in abeyance, awaiting the argument of a related case. See *Normanoch Association v. Deiser,* 40 *N. J.* 100 (1963).

Normanoch is a corporation organized in 1929 by owners of lands in the vicinity of Culvers Lake for the purpose of acquiring title to the lake bed. Baldasanno is an owner of a lakeside lot, who claims title in the lake bed to the extent of 200 feet in front of said lot. It is this 200-foot segment of the lake which is here involved.

Normanoch, asserting title to the entire lake bed, brought suit seeking to enjoin Baldasanno from making use of the waters in front of his property for boating, fishing, swimming, maintaining a dock and boathouse, and piping water. It also demanded damages for Baldasanno's alleged past acts of trespass.

Baldasanno filed an answer denying Normanoch's title. Although other defenses were raised in the answer, the pretrial order limited the issues to (1) whether Normanoch had title to the land involved, (2) whether Baldasanno had trespassed thereon, and (3) whether Normanoch was entitled to an injunction and damages.

After plenary trial, the Chancery Division concluded that Normanoch did not have title to the bed of the lake to the

shoreline but, on the contrary, that title to the underwater lands extending 200 feet into the lake adjacent to the high land of the Baldasanno lot was vested in him. Subsequent to the rendering of this opinion, Baldasanno was permitted to file a counterclaim asserting his ownership in said lands and demanding an adjudication to that effect on the basis of the proof already presented.

Final judgment was then entered dismissing Normanoch's complaint and adjudging that Baldasanno had title to the aforementioned portion of the lake bed. From this judgment Normanoch appealed to the Appellate Division. Before argument there, this court certified the appeal on application. *R. R.* 1:10–1(a).

Normanoch bottoms its claim to title (1) upon estoppel arising from a judgment entered in prior litigation (*Baker v. Normanoch Ass'n. Inc.*, 25 *N. J.* 407 (1957)) and (2) as ultimate successor in title to the original grantee in a deed dated September 1, 1882 from the Board of Proprietors of the Eastern Division of New Jersey (Proprietors) to Nathaniel Niles encompassing in its terms the waters of Culvers Lake.

Baldasanno (1) denies that the court in *Baker v. Normanoch Ass'n. Inc.*, *supra*, adjudged title to the disputed lands to be in Normanoch, and (2) asserts that title to those underwater lands is vested in him as the ultimate successor in title to a portion of an original grant from the Proprietors to John Rutherfurd surveyed July 31, 1828 and recorded in the office of the Proprietors on May 23, 1834.

We shall first consider Normanoch's contention that Baldasanno is estopped from contesting its title by virtue of the judgment in *Baker, supra.*

In that case a number of owners of property surrounding Culvers Lake sought a judgment declaratory of their rights to use Culvers Lake for recreational purposes. The plaintiffs were divided in the pretrial order into four classes. Baldasanno was included within the class which claimed title

to a part of the lake bed. As to that class the late Justice Burling said, 25 *N. J.*, at *p.* 419:

"For the purposes of the present controversy we need go no farther than to hold that where, as here, one party is the undisputed owner of the substantial portion of the bed he may exclude therefrom owners of minimal portions of the bed. These plaintiffs are restricted to the use of such portions of the waters of the lake, the bed of which they may own."

The final judgment entered pursuant to the mandate of this court in modification of the original judgment recited:

"(1) That defendant Normanoch Association, Inc. owns and holds title to the major portion of the bed and waters of Culver Lake, and that ownership of the vast portion of the present boundaries of the lake is in said defendant; * * *.

(2) That no determination is being made as to the precise boundaries between the lands owned by defendant Normanoch Association, Inc. and those owned by those plaintiffs claiming title by deed to portions of the bed of the lake; * * *."

The express terms of the opinion and the final judgment in *Baker, supra,* militate against Normanoch's contention. The question of title here involved was not determined in that suit and Baldasanno is, therefore, not estopped from contesting Normanoch's purported title.

We come, therefore, to the primary, remaining issue, whether the Rutherfurd grant or the Niles deed encompassed the lands in question.

Basically, the solution of this problem depends upon the location of the perimeter of the lake as it existed either at the time of the survey made for Rutherfurd on July 31, 1828 or at the recordation thereof on May 23, 1834, as Niles could have obtained title in 1882 to but so much of any lands which might now be submerged as were excepted from the Rutherfurd grant. Since the ultimate decision depends upon these two chains of title the sequence of grants and conveyances will be outlined. Each will be separately listed, Baldasanno's claim first because therein lies the nub of the question.

Prefatory to an analysis of the respective chains of title, however, some brief history of the Proprietors and their methods of conveying title, a detailed recital of which is contained in *Proprietors of Eastern Division of New Jersey v. Force's Executors, 72 N. J. Eq. 56 (Ch. 1896)*, is in order. The Proprietors, in 1682, became successors to the lands once held by Sir George Carteret and were thereby vested with title to lands in that portion of the colony known as Eastern New Jersey. In some instances the Proprietors sold lands to the public and conveyed title by deed. The more common method of land disposition was by the issuance to its members of special warrants or right of locations by way of dividends. These instruments came to be known as "warrants" or "rights" and entitled the holder to have set off to him a certain number of acres in severalty wherever he chose to locate them, if the warrants were unrestricted, or in a special locality if they were restricted. When issued, the warrants were credited to the proprietor in a book of the Proprietors designated a "warrant book."

The mode of locating land under a warrant of location was as follows: The owner of the warrant having chosen his land applied to the Surveyor General of the Proprietors to survey it for him. As it was impracticable for the Surveyor General to make all such surveys the practice had been from early times for that officer to appoint Deputy Surveyors in the various parts of the domain and for the holder of the warrant to employ one of these Deputy Surveyors to survey the land. The Deputy then certified that he had surveyed the land at the request of the warrant-holder, gave its metes and bounds description and contents together with a map and computation of contents annexed, and sent the certificate of survey to the Surveyor General. This certificate came to be called simply a "survey." The Surveyor General, having examined the documents and verified the accuracy of the survey and computations, made a certificate—called a "return"— of the land so surveyed to the holder of the warrant and transmitted it to the register of the Proprietors who charged the number of

acres contained in it against the account of the holder of the warrant on the warrant-books of the Proprietors. The Proprietors in council assembled, then approved and recorded the certificate.

As to the vesting of title by these warrants, Chief Justice Kirkpatrick said, in *Arnold v. Mundy, 6 N. J. L.* 1, at *pp.* 67–68 (*Sup. Ct.* 1821):

"The proprietors of East Jersey are tenants in common of the soil; their mode of severing this common estate is by issuing warrants, from time to time, to the several proprietors, according to their respective rights, authorizing them to survey and appropriate in severalty, the quantities therein contained. Such warrant does not convey a title to the proprietor, he had that before; it only authorizes him to sever so much from the common stock, and when so severed, by the proper officer, it operates as a release to him for so much. This is the case when the proprietor locates for himself. When he sells his warrant to another, that other becomes a tenant in common with all the proprietors *pro tanto*, and, in the same manner, he proceeds to convert his common, into a several, right. Regularly there is a deed of conveyance upon the transfer of this warrant for so much of the common property and that deed of conveyance, and the survey upon the warrant, is the title of the transferee. It is true, that the survey must be inspected and approved by the board of proprietors, and must be carefully entered and kept in the secretary's office, or in the office of the surveyor-general of the division, but this is for the sake of security, order, and regularity only, and is, by no means, the passing of the title. It proves that the title has already passed, but it is not the means of passing it. It may be likened to the acknowledgement of a deed by a *femme covert*. Her deed cannot prevail against her, unless such acknowledgment be regularly made and recorded; yet such acknowledgment does not pass the title, the deed has already done that, and it operates from the day of its date."

And again, 6 *N. J. L.*, at *p.* 69:

"* * * The truth is, I believe, that the survey of the proper officers, under a warrant duly issued for that purpose, has always been considered as the act of severance; the inspecting, approving, and recording, as relating back to that act; and the party surveying, as having an estate in severalty from that time. And, of course, except in the case of posterier surveys, the time of inspecting, approving and recording has not been thought material. And, as to the mode of partition, however necessary it may have been in other cases

of tenancy in common, that it should be made by deed; yet in this proprietary estate, upon locations of this kind, I believe it never has been so done."

In 1774 the Proprietors had lands in Sussex County surveyed, and subdivided the area into numerous "Great Lots," the tract being designated the "Sussex Allotments." Title to the major portion of Great Lots 45 and 46 of the Sussex Allotments, within whose bounds lies the greater part of Culvers Lake, remained vested in the Proprietors in 1828, grants having been made of some portions thereof prior to that date.

## Baldasanno's Title

In 1828, John Rutherfurd, a New York lawyer and a member and president of the Proprietors who had over the years acquired a number of warrants under which no land had yet been appropriated, caused Great Lots 45 and 46 to be surveyed for him by Deputy Surveyor Richard M. Lawrence. Baldasanno's lot lies within the confines of Great Lot 46. The description of Great Lot 46 as contained in the Lawrence survey dated July 21, 1828 recites the area of that Lot to be 1,426 acres. Within its bounds were portions of two natural bodies of water, one known as Round or Great Pond, now known and herein referred to as Culvers Lake, the other as Long Pond, now known as Lake Owassa. The description excepted from the total 1,426-acre area, lands theretofore granted to others, as well as 207.99 acres recited as covered by a part of Culvers Lake within Lot 46 and 24.83 acres recited as covered by a part of Long Pond within that Lot. Neither of these bodies of water was described by metes and bounds in the survey nor do there appear delineated on the accompanying Lawrence map any bearings, distances or stations around the perimeter of the lakes. The net acreage appropriated within the survey after deducting these excepted acreages was 1,000 acres. Although according to its terms, the survey was made on July 31, 1828, for some unexplained reason the return was not issued and recorded until May 23, 1834. The

survey of Lot 45, made a few weeks later in 1828, also remained unrecorded until 1834.

Title to this property remained in Rutherfurd until his death. In 1867 John Rutherfurd, his grandson, having obtained title to the entire tract, conveyed, together with his wife, Charlotte, a portion thereof containing the lands now owned by Baldasanno, to Stephen H. Condict, the deed containing a description which reads, in part: "(4) * * * to the edge of Round Pond [Culvers Lake]; thence (5) along the same north 53¼ degrees, east 1 chain and 18 links; thence (6) along shore of the said pond southeasterly following the several courses thereof to a stake in said southeast line of Lot 46; * * *." Mesne conveyances containing the same description carried title to 1891 when the Condict tract was fragmentized and a portion thereof conveyed by Nathaniel Burtis and Mary, his wife, to Robert Duncan by a description which gave as one of the boundaries "a heap of stones on the back of the pond." Title to that portion of the lands next went to one Snook, who subdivided the tract, of which two contiguous waterfront lots ultimately vested in defendant. In some of his deeds conveying lots in the tract Snook included a clause, "together with the right, title and interest of the parties of the first part in and to the waters of said Culvers Lake adjoining the said premises and the land thereunder." The lots in question were conveyed out of the tract separately in 1913. The deed to one of the lots carried the above-quoted clause. The other did not. Both lots came into a common grantor in 1925 and Baldasanno is a remote grantee under that grantor. Baldasanno's single deed to both lots still includes the lake rights clause but only as to one of the two lots. It is this provision which is relied upon by Baldasanno as giving him the interest in the underwater lands. But of course the clause gave him nothing if his immediate and remote grantors had no right, title and interest to convey. It should also be noted that the description in this latter deed recites the bank of the lake as one of the main lot boundaries.

### NORMANOCH'S TITLE

In 1882 the Proprietors conveyed to Niles by a single deed their right, title and interest in Lake Hopatcong, Culvers Lake and Quicks Pond together with a 300-foot margin of land around said waters. Both parties here admit, as they did in *Baker, supra*, that the Proprietors had no title to these marginal lands, and they thereby eliminate discussion of title to them. No metes and bounds description for any of the lakes appears in the Niles deed, the description being, as far as here pertinent:

"* * * the lands covered by the waters of Culvers Lake * * * a map thereof being filed in the said office of the Surveyor General."

The map referred to was made in 1882 by William Roome, son of Benjamin Roome, a Deputy Surveyor, and is known as the "Roome survey."

The lake subsequently was conveyed on a number of occasions with the description contained in the Niles deed until May 10, 1921, when Julia Smith, then in title, and her husband, James M. Smith, conveyed to Normanoch Association (old Normanoch), the predecessor of present plaintiff, by a metes and bounds description together with a quantity recital of 464.65 acres, both taken from the Roome survey. The description concludes, "Being the land covered by the waters of Culver Lake." In 1929 old Normanoch conveyed to plaintiff with a description identical to that in its deed from Smith.

We come then to a consideration of the proofs of the respective parties' claims to title.

The difficulty with this feature of the case is traceable to the fact that the Lawrence survey contains no metes and bounds description of the outlines of the portions of the lake excepted from the 1828 Rutherfurd grant of Great Lot 46. Since the Rutherfurd grant does not contain any such metes and bounds description, the only clue in the record as to the size of the lake in that year, and hence its perimeter, is

furnished by the quantity recitals of acreage exceptions contained in the Lawrence surveys of Great Lots 45 and 46 within which lots lay approximately two-thirds of the lake. To state what was made available at the trial on this point, however, is to expose the missing part of the puzzle, for there have been placed in the record no other documents of a vintage earlier than 1882 purporting to show either the acreage of the one-third portion of the lake lying outside Great Lots 45 and 46 or the metes and bounds of the outline of the whole lake. In 1882 we find the Roome survey which delineates this final one-third portion of the lake and at least a major portion of the balance of the lake. The absence of an actual survey or definitive description of the shore of the lake in 1828, the lack of proof of the actual size of the lake in that year, the causes and the amount of increase in size, if there has been an increase since that date, the lack of proof of the past dimensions of a large portion of the lake prior to 1882, and the dimensions of the entire lake prior to 1955, have generated the confusion which exists.

█ It must be borne in mind in connection with what here follows that the prime consideration in determining the meaning of the basic title instruments is the intention of the parties. The burden of proving such intention is upon the party claiming title. *Baker v. Normanoch Assn., Inc., supra,* 25 *N. J.,* at *p.* 417.

█ Absent known and definite boundaries in a grant, the quantity reference therein contained may be employed as an aid to the ascertainment of the premises intended to be conveyed. *Fuller v. Carr,* 33 *N. J. L.* 157, 160 (*Sup. Ct.* 1868). The same rules applicable to the identification of the subject matter of a grant apply with equal force to the subject matter of an exception from a grant. *Mitchell v. D'Olier,* 68 *N. J. L.* 375, 383, 59 *L. R. A.* 949 (*E. & A.* 1902). Where the description is not by metes and bounds but by a reference to an area with a recognized meaning, such as a lake or a farm, and where that description also contains a statement of quantity, the latter must bow to the

former if the real intention was to convey the lands that are recognizable through the descriptive designation. See *Andrews et ux. v. Rue*, 34 *N. J. L.* 402 (*Sup. Ct.* 1871).

## I.

We shall initially consider plaintiff's proofs. Normanoch introduced the deed from the Proprietors to Niles containing the description above noted, together with the Roome survey of 1882, and the mesne conveyances in its chain, demonstrating the final vesting of the Niles lands in it. Normanoch also introduced a map of Culvers Lake prepared by Snook and Hardin, engineers, from a survey run by them in 1955 upon which is superimposed the Roome survey. The Snook-Hardin survey of the lake as it now exists and the protraction of the Roome survey thereon demonstrate that the present shoreline adjoining the Baldasanno lot is identical with the Roome survey line at that point. Normanoch thus established a *prima facie* title to the shoreline of the lake as it presently exists, bounding the Baldasanno lots. See *Rollins v. Atlantic R. R. Co.*, 70 *N. J. L.* 664 (*E. & A.* 1904), *Troth v. Smith*, 68 *N. J. L.* 36 (*Sup. Ct.* 1902).

## II.

At that posture of the trial, Baldasanno had to rebut Normanoch's *prima facie* title by attacking it or by undertaking the affirmative burden of establishing either, title in some third person, *Den ex dem. Falkenburgh v. Camp*, 3 *N. J. L.* 365 (*Sup. Ct.* 1811), or a superior title in himself. *Troth v. Smith, supra.* He elected to refute Normanoch's *prima facie* proof of title by proof of the superiority of his claim to the subaqueous lands here in question. This he attempted by adducing proof which he asserts demonstrates, (1) that the outbounds of the lake in front of his lands have changed between 1828 and 1882, and (2) that the Snook-Hardin protraction of the Roome survey is inaccurate.

We shall first consider Baldasanno's allegation that the shoreline changed *post* 1828. Baldasanno asserts that Rutherfurd's title to Great Lot 46 vested in 1828 and extended to the then existing shore of the lake. The perimeter of the lake, he says, was radically changed to its present contour in 1829 by the construction of a dam and mill at the lake's natural outflow. The resultant flooding inundated some of the highland within the confines of the Rutherfurd grant, including portions of the lots which he owns. Baldasanno concludes that the 1882 conveyance to Niles was ineffective to pass title to the lands that had so become submerged, since they previously had been granted to Rutherfurd.

Normanoch argues that even though such inundation in 1829 be admitted, the issue of flooding is without any significance since title to Great Lot 46 passed to Rutherfurd when the Lawrence survey was recorded in 1834. It argues that the lake exception in the Rutherfurd grant applied to the lake as it existed in 1834, the year of recordation, and not in 1828, the year of the survey, so that title to all of the lands which were submerged in 1834 remained in the Proprietors, available to be conveyed subsequently to Niles. It agrees with Baldasanno that the 1834 and the present waterline are identical. Therefore, Normanoch concludes that the subaqueous lands in front of the Baldasanno lots never vested in Rutherfurd and hence never vested in Baldasanno as the ultimate successor to Rutherfurd.

However, Normanoch contends that, in actuality, no flooding occurred subsequent to 1828, and the present lake level and the shoreline have remained unchanged since that time. It reasons that the Rutherfurd exception consequently ran to the present shoreline so that the underwater lands adjacent to the Baldasanno lots were excluded from the Rutherfurd grant.

### A.

In considering the effect of Baldasanno's claim that the shoreline of the lake had changed in 1829, we

initially must determine the date of the vesting of title in Rutherfurd. Normanoch's argument that no vesting could occur until recordation in 1834 is without merit. As noted in the above-quoted portions of the opinion in *Arnold v. Mundy, supra,* the Proprietors were, among themselves, tenants in common to the lands in Eastern New Jersey. A survey under a warrant duly issued to a Proprietor amounted to a severance of the lands thus appropriated. It was a form of partition which vested the warrant-holder with individual title to the lands described in the return, from the date of the survey. The recordation was merely for the sake of "security, order and regularity," serving as proof that title had passed on the date of the survey, rather than being the means of passing title. Rutherfurd thus became vested with title on the date of the Lawrence survey, *i. e.,* July 31, 1828.

## B.

We must, then, proceed to Baldasanno's contention that a portion of the upland of his lots existing in 1828 was flooded in 1829.

Baldasanno adds the lake acreages recited as exceptions in the 1828 Lawrence description of Great Lots 45 and 46, amounting to 320 acres, to the balance of the lake acreage shown in the 1882 Roome survey of 133.05 acres, and concludes that the waters of Culvers Lake covered 453.05 acres in 1828. His utilization of this latter figure from the Roome survey of 1882 to establish the lake area in 1828, without any further explanation, is inconsistent with his contention that the lake area was increased in 1829.

Baldasanno further contends that the entire lake bed exceeded 692 acres in 1829 and that the area and periphery of the lake have not changed to any substantial extent since that date. The increase in water coverage between 1828 and the present, he says, is accounted for by the construction of a dam and mill near the natural lake outflow in 1829 which immediately raised the depth of the lake waters to the extent of

approximately seven feet. He rationalizes that some of the land bordering the lake which was high and dry in 1828, when the lake was in its natural state, was thus inundated and has continued to be so inundated to date. He asserts that within this artificially submerged high land is a portion of the Rutherfurd grant including a part of the land to which he eventually obtained title. The result, he argues, is that the conveyance of 1882 could not have vested Niles, or Normanoch, his ultimate successor, with any title to the lands so inundated since they previously had been granted to Rutherfurd.

In seeking to establish such a state of facts, Baldasanno is confronted with the presumption that, where a description of lands contained in a deed or grant without metes and bounds description calls for a natural monument or boundary such as a river or a natural lake, and an actual survey is subsequently run, the monument or boundary as delineated by the survey has so existed in such conformation and has continued unchanged from the date of the original deed or grant. *Shapleigh v. United Farms Co.*, 100 *F. 2d* 287 (5 *Cir.* 1938). See *Elizabeth v. Central R. R. Co. of N. J.*, 79 *N. J. L.* 542 (*E. & A.* 1910); *Greenspan v. Yaple*, 201 *App. Div.* 575, 194 *N. Y. S.* 658 (*App. Div.* 1922); *Green v. Horn*, 142 *App. Div.* 90, 126 *N. Y. S.* 486, 488 (*App. Div.* 1910); *In re East River Drive, Borough of Manhattan*, 159 *Misc.* 741, 289 *N. Y. S.* 433, 443 (*Sup. Ct.* 1936); *C. J. Boundaries*, § 300 (1916).

The effect of such a presumption is illustrated in *Elizabeth v. Central R. R. Co. of N. J., supra,* where the court stated, 79 *N. J. L.*, at *p.* 547:

"The claim of the defendant is that the shore line of the Sound has been added to by accretions or deposits since the dedication of the highway, and that the *locus in quo* lies entirely within the boundary of such new made land, and therefore it is the owner thereof under its riparian grant from the state of all the land between the original high-water mark, and the present high-water mark of the Sound, which grant it claims destroys whatever easement the plaintiff may have by operation of law over the land which may have

been reclaimed since the highway was dedicated by the state. As this claim, if established, would result in overthrowing the plaintiff's *prima facie* case and make in favor of the defendant's title, which depends upon the true location of the original high-water mark, that being one of the boundaries of its alleged grant, *we think that the duty of showing such original high-water line rests upon the defendant.*" (Emphasis supplied)

 Relating the above to the facts of the case *sub judice,* it becomes apparent that at the close of Normanoch's case, there arose a presumption that the outline of so much of the lake as is here involved was, in 1828, identical with the shore as shown on the first survey made available for our consideration, *i. e.,* the Roome survey. The duty of showing any deviation from the shore so disclosed became that of Baldasanno.

The proof adduced by Baldasanno to bolster his contention must thus be examined:

A memorandum discovered in the office of the New Jersey Division of Water Power and Supply serves as Baldasanno's basic "evidence" of the alleged dam construction in 1829 and the consequential increase in lake area, and it constitutes the primary evidence relied upon by the trial court. This record consists of written memoranda on a printed from which reads:

"Paulinskill Culvers Lake

*Dams in New Jersey—Reference Data* No. 21–3
*Name of Owner*—C. H. Crisman
*Address*—Branchville, N. J.
*Name of Dam*—Culvers Lake *County* Sussex *Location* 21.25.4.2.9
*CONSTRUCTION:—Date* 1829 *By whom*
*Stream*—Small Branch *Tributary* to Paulinskill
*Drainage Basin:— Area* 6.3 *sq. mi. Description*
*Description of valley below dam*
*DAMAGE FROM FAILURE:*—Probable
*Previous* (*date*)
*Purpose*—Pleasure and water power. *Type* Concrete
*Foundation*
*Length*—50 *ft. Max. Height*—5 *ft. Max. width of*
*base ft.*
*Upstream slope Downstream slope Volume*
*Cu. yds.*

*SPILLWAY:—Type* Concrete *Length*—40 ft.
*Depth below top of* abutment—1½ ft. *Capacity* c.f.s.
*per sq. mi.*
*RESERVOIR:—Capacity* mill. gals. *Area* 692 *acres.*
*Length ft.* 464 (7' down)
*Outlets* 30" sluice pipe to drawn down 7' (in) out
*Remarks*
*Source of data*—H. T. C. inspection on ground
accompanied by
Mr. Crisman <em>Date</em> 9/15/22"

(The italicized portions are printed on the original form.)

The exhibit was admitted under the Business Records as Evidence Act, *N. J. S.* 2A:82–34, *et seq.*, without objection. Although there is grave doubt that the memorandum meets the statutory requirement of preparation "at or near the time of the act, condition or event, and * * * the sources of information, method and time of preparation were such as to justify its admission." (*N. J. S.* 2A:82–35), we shall proceed to consider its credibility.

Baldasanno assumes that the C. H. Crisman therein referred to was one "Christman" who allegedly once held title to the dam property for some undisclosed period of time. The record furnishes no proof of the Christman title, no abstract of the dam property title, nor any source for the statement as to the dam construction date. The compiler of the data, designated by the initials "H. T. C." was admittedly H. T. Critchlow, former director and chief engineer of the Division in 1922. We are not furnished with the sources from which Critchlow compiled his information, nor any explanation of the purpose of this memorandum.

Additionally, the reference in that document to "464 acres (7' down)" cannot be relied upon, without further testimonial explanation, to establish that the lake level was raised seven feet by a dam construction in 1829 or that the original underwater acreage was 464 acres. This hearsay offering in the garb of an official record made in 1922, 93 years after the alleged occurrence of the event, provides insufficient foundation upon which to base a conclusion that a dam was built in

1829 and resulted in an immediate increase in water coverage of over 150 acres, thus causing Baldasanno's lands to be flooded.

The only testimony of the present acreage of the lake is that of Baldasanno's engineer, Williams, who stated that he approximated the size of the lake as being over 600 acres. No computation is furnished to sustain this conclusion. Apparently counsel did not see fit to further probe the question of the actual present lake size, although determination of the present acreage from the Snook-Hardin survey appears simple.

Baldasanno compares the 453.05 acres computed from the Roome survey, as above noted, and the conformation of the underwater lands thereon, with his 600 to 692-acre area figures of 1829, and the admitted presently accurate conformation as shown on the Snook-Hardin survey of 1955, and concludes that the Roome survey inaccurately portrayed the lands covered by Culvers Lake in 1882. At no point does he dispute that the Roome survey, as protracted by Snook-Hardin on its map, covers approximately 464 acres of Culvers Lake. He relates the Water Policy record, which recites the lake area as 692 acres in 1922, and his engineer Williams' statement that he estimates the area to be approximately 600 acres, to that portion of the lake included within the Roome survey. It must be remembered that we are interested in the area of the lake *post* 1828 only insofar as its size may make a possible inroad upon the Rutherfurd lands now owned by Baldasanno. Unless he shows that the portion of the lake in the vicinity of his lots as shown by Roome was expanded subsequent to 1828, the entire thesis of his title to these lands must fail.

With minor exceptions, the Snook-Hardin protraction manifests the Roome survey to be identical with the present shore of the entire main body of the lake. However, the Roome survey as so protracted does not include the present northwest portion of Culvers Lake known as Meyers Cove, nor a body of water to the southeast of Culvers Lake proper

and separated therefrom by a causeway. (This latter body of water is hereafter referred to as Transcauseway.) These two sections are at the two lake intakes. We are not furnished with any proof of whether Meyers Cove and Transcauseway were portions of Culvers Lake in 1828 or 1882. Nor are we supplied with any explanation of their absence from the 1882 survey. From other deeds of the approximate vintage of 1882, and from testimony in *Baker v. Normanoch Ass'n, Inc., supra,* classifying the major portions of these sections as swamps, as well as from a recent photograph showing Transcauseway as largely swamp land, it is reasonable to conclude that those sections were not considered portions of the lake proper but rather marginal marsh land in those early times.

Additionally, an examination of the Rutherfurd grant, the Roome survey and the protraction of the Roome and Snook-Hardin surveys demonstrates Baldasanno's faulty conclusion that the Roome survey is inaccurate because . he bottoms his argument upon the fallacious premise that the recitals of the acreage exclusion of the lake in the Rutherfurd grants of Great Lots 45 and 46, as well as the delineation of Culvers Lake in the Roome map, encompassed the entire area covered by the lake as it existed on the respective dates thereof.

Protracted on the Roome survey are various grants recited in the Rutherfurd grant as being prior thereto and excepted therefrom. These grants are as well shown on the Snook-Hardin and Roome maps and described in the Roome survey. Also protracted on the Snook-Hardin and Roome maps are other grants antedating 1882.

The Snook-Hardin and Roome protractions of conveyances and grants by the Proprietors prior to 1828 and the Roome descriptions thereof disclose a reason for the nondelineation of Meyers Cove and Transcauseway, if they existed in 1828 or 1882, on the Roome map, and point up the error in Baldasanno's position. Practically all of Meyers Cove falls either within that portion of the Rutherfurd grant which

subsequently vested in Stephen Condict in 1867 or within a portion of the Oliver Delancey and Henry Cuyler grant of September 10, 1770. The Transcauseway section falls entirely within the confines of a grant to Oliver Delancey and Henry Cuyler dated January 14, 1767 and a grant to Andrew Bell dated June 28, 1811. The Roome survey follows two courses of the Rutherfurd-Condict deed and two courses of the Delancey-Cuyler grant of 1770 in the Meyers Cove area, both of which separate Meyers Cove from the lake proper, thus excluding Meyers Cove. The Roome map also follows three courses of the Bell grant which divide Transcauseway from the lake proper and so exclude Transcauseway from the Niles conveyance. By relating the Roome survey protractions to the Lawrence survey and its listed exceptions, it is seen that the Lawrence computation of the excepted lake area included only so much of the lake as had not been conveyed by the Proprietors prior to 1828.

It is reasonable to conclude, therefore, that most of Meyers Cove and all of Transcauseway, even though they existed as parts of the lake in 1828, were intentionally not included by Lawrence in his computations of lake exceptions because the Proprietors had divested themselves of title thereto prior to 1828 and Lawrence had expressly excepted those acreages by reference to such prior grants.

 In like fashion, Roome even more clearly showed that it was intended by the parties to include in the Niles conveyance only so much of the lake as had not theretofore been granted or conveyed by the Proprietors. The Roome survey, as filed with the Proprietors, reads in part in its introduction: "Sir: I have surveyed for Nathaniel Niles, all that tract of *unappropriated* water, known as Culver's Pond." (Emphasis supplied) After the conclusion of the detailed description, the following appears, "being bounded by the lines of the several surveys herein recited." It therefore becomes clear that the description in the Niles deed conveying "the lands covered by the waters of Culvers Lake * * * a map thereof being filed in the said office of the Surveyor General"

was construed by the parties as intending to mean *"so much of* the lands covered by the waters of Culvers Lake as have not heretofore been granted or conveyed by the Proprietors, *and as are shown* on a map thereof being filed in the said office of the Surveyor General." The Roome survey, therefore, included only so much of Culvers Lake as was intended to be conveyed, *i. e.,* that which remained vested in the Proprietors in 1882. Its accuracy, including the shoreline at the Baldasanno lots, is not affected by the absence of Meyers Cove and Transcauseway therefrom.

Additionally, although neither party offered proof of the present acreage of Culvers Lake, the court has, for its own information, using the Snook-Hardin map, obtained a planimeter computation of the area of the lands thereon shown within the Roome survey. Meyers Cove and Transcauseway sections were not included. The area of this ascertained portion of the lake is approximately 470 acres and not 692 acres as claimed by Baldasanno. This result substantially comports with the quantity recital of the Roome survey computed by the Triangulation Method, which shows this area as having been 464 acres in 1882, and the exceptions in the Lawrence surveys of 1828 of Great Lots 45 and 46 which, when added to the southerly third of the lake shown as 133.05 acres on the Roome survey of 1882, would result in a total area of 453.05 acres. The natural conclusions are that the Roome survey is accurate and that there was comparatively little change in the area and hence in the outbounds of the portion of the lake within the Roome survey from 1828 to 1882.

A further study of the Snook-Hardin protracted survey shows that all the courses of those surveys and grants prior to 1882 bounding upon the lake, although not following the exact sinuosities of the shore, run and are recited as running along the actual shore as shown by Roome in 1882 and the shore as it presently exists. The portions of these surveys are: (1) a part of the Rutherfurd grant as conveyed to Condict by deed of 1867, running along a part of the westerly shore of the lake; (2) the Delancey and Cuyler grant of 1770

running along a part of the northerly shore; (3) the Bell grant of 1816 running along a part of the easterly shore; (4) the John Stoll grant of January 13, 1773 running along a part of the westerly shore; (5) the John Gustin grant of April 15, 1808 running along a part of the southerly shore. Additionally, a grant to Richard M. Lawrence of November 4, 1851, which is a continuance of one course of the Gustin grant, runs along the balance of the southerly shore. The sole logical explanation of the original location of these lines along the present shoreline of the lake, is that the outbounds of the lake have not materially changed since the respective dates of those ancient grants. This strengthens the conclusion that the Roome survey evinced the shore of that portion of the lake, with which we are interested, as it actually existed in 1882, and that no appreciable change occurred in that line from 1828 to 1882.

Baldasanno's argument includes the further assertion that the present dam at the natural outflow of the lake is identical with an original dam constructed in 1829 which caused the flooding in that year. The testimony of the engineers and residents of the area concerning the effect of this present dam on the water level of the lake is conflicting and inconclusive. The testimony also discloses that two or three "new" dams were erected in more recent times subsequent to 1829 in the vicinity of the so-called "original" dam, the surfaces of which are now under more than four feet of water. However, no proof was submitted as to the dates of the construction of any of these dams, their precise location, or their individual or combined effect upon the area of the lake.

Proof for the conclusion that a dam was constructed before 1828 is found in the descriptions contained in (1) a grant by the Proprietors to John Stoll in 1811 which refers to Culvers Lake as "Beemers Mill Pond" and includes in the description the phrase, referring to the lake outlet, "where Beemer's Mill Brook empties out of said pond," and (2) a grant from the Proprietors to Martin Ryerson in 1816 which refers to Culvers Lake as "a large pond of water called the mill pond

or Culver's pond" and contains the description "where the waters of said pond discharge themselves and from what is called the mill brook." Interestingly, in the Stoll grant, within the Roome survey description of grants prior to 1882 as filed in the office of the Proprietors, following the words "Beemer's Mill Pond," appears the notation "(Beemer's Mill Pond 1773—Culvers Lake—Round Pond—and Great Pond—all the same pond)." For a mill to have existed in 1816, there would undoubtedly then have had to be a dam. This would have caused an increase in lake area over its natural coverage considerably before 1828.

Baldasanno also implies that Roome never ran an on-the-ground survey but merely pieced out neighboring surveys and demonstrated by what is called the exclusive process, the existence of the unappropriated lake, and that the outline of the lake shown on his survey plotting is inaccurate. His sole basis for such a conclusion is a statement of general custom found in *Proprietors of Eastern New Jersey v. Force's Executors, supra, 72 N. J. Eq.,* at *p.* 72. This cannot be accepted as impeachment of the Roome survey. Factually, it would be remarkable, indeed, for Roome to have falsified the many natural monuments, call points, and stations shown in this survey. These include a notation on the plotting showing a "Beginning of Pond Survey" as well as call points of "Red Oak," "Hickory," "Pepperidge," "Maple," and "Elm" trees. We are not informed of any prior surveys from which these designations could have been copied. The return of said survey as filed with the Counsel of Proprietors contains the notation "Wm. Roome, Wm. Airy, chain bearers, Benj. Roome, Deputy Surveyor." To agree with Baldasanno would require labelling this certificate false, without proof. Baldasanno did not sustain his contention that Roome did not actually survey the lake.

In order to locate the outbounds of the Rutherfurd grant in the locality of Baldasanno's lots, his engineer, Williams, took soundings in the lake until he reached a depth of seven feet. The seven-foot depth was selected because Williams hypothe-

sized that the present dam was constructed subsequent to 1828. He estimated from his inspection of the dam that its removal would result in a lowering of the water level to the extent of seven feet. He concluded that the shoreline in 1828 must have been located at this depth, and from his soundings determined that the original lake bank lay 200 feet toward the center of the lake from the present shore of the Baldasanno lot. The testimony was sufficiently rebutted by Hardin, Normanoch's engineer, who has been familiar with Culvers Lake for 60 years. He testified that in his opinion there was no dam constructed in 1829 at the natural outlet and that the removal of the present dam would not lower the lake level by seven feet.

We conclude, therefore, that Baldasanno did not introduce sufficient evidence to rebut the presumption that the shore boundary of his lots had not changed between 1828 and 1882. *In re Blake's Will,* 21 *N. J.* 50, 58 (1956).

The second thrust of Baldasanno's attack is directed at the Snook-Hardin protraction of the Roome survey. For this purpose Baldasanno employs the testimony of his engineer Williams who testified that the Roome survey, if properly protracted on the present shoreline, would be some 400 feet upland of the present water line at the Baldasanno lots. In the light of all the other evidence above referred to, as well as the testimony of Toy, who actually ran the Snook-Hardin survey, we conclude that Baldasanno did not sustain his contention that the Snook-Hardin map improperly delineated the Roome survey in relation to the present shoreline.

We conclude, therefore, that Baldasanno did not disprove that Normanoch had title to the submerged lands in question, nor did he establish his own title.

The foregoing renders any treatment of other arguments advanced by either party unnecessary.

Normanoch stated in the pretrial order, "Plaintiff is unable to fix damages at this time." It did not offer any proof of damages at the trial nor did it proffer any argument in its brief as to its entitlement thereto. At oral argument counsel

for Normanoch stated that it had abandoned this original demand for relief.

Accordingly, the judgment must be reversed and the matter remanded to the trial court for entry of judgment for the plaintiff, on its demand for a mandatory and prohibitory injunction, and for entry of judgment against Baldasanno.

Reversed and remanded for judgment consistent with the foregoing opinion. No costs.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For affirmance*—None.