983 A.2d 1122 (2009)
410 N.J. Super. 564
John Jay BOYLAN and Belle Boylan Constantin, Plaintiffs-Appellants,
v.
The BOROUGH OF POINT PLEASANT BEACH, Defendant-Respondent.
DOCKET NO. A-0234-08T2.
Superior Court of New Jersey, Appellate Division.
Argued September 24, 2009.
Decided December 4, 2009.
*1124 Michael J. Fasano, Freehold, argued the cause for appellants (Lomurro, Davison, Eastman & Munoz, attorneys; Gary P. McLean, of counsel; Mr. Fasano, on the brief).
Kevin N. Starkey, Brick, and Edmund J. Corrigan, Toms River, argued the cause for respondent (Starkey, Kelly, Bauer, Kenneally & Cunningham, and Hiering, Gannon & McKenna, attorneys; Mr. Starkey, on the brief).
Before Judges SKILLMAN, FUENTES and SIMONELLI.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
This appeal involves a dispute concerning title to an approximately seventy-five foot wide area of oceanfront property that the defendant Borough of Point Pleasant Beach is presently using as part of its municipal beach.
Plaintiffs' claim of title is based on the part of a 1921 deed to their predecessors in title that described the oceanfront lot as including "so much of Lot No. 1 in Block No. 9 as has not been submerged to high water mark in the Atlantic Ocean be the same what it may." Plaintiffs contend that under this description the eastern boundary of their lot extends to the mean high water mark of the Atlantic Ocean. The trial court rejected this contention and entered final judgment in Point Pleasant's favor. We affirm.
This title dispute involves one of sixty-three lots in a seventy-acre oceanfront property that was subdivided in 1920. The filed subdivision map described the property as "70 Acres with Oceanfront." The subdivision included twelve oceanfront lots, one of which was lot 1 in block 9, the lot now owned by plaintiffs.
The subdivision map depicted the eastern boundary of the oceanfront lots as a straight line and gave precise measurements for the lot lines. The subdivision map described the land beyond the eastern boundaries of the oceanfront lots as "Beach."
Plaintiffs' oceanfront lot is an irregular shaped property that is shown as fifty feet wide along its western boundary on a paper street called East Avenue and 72.995 feet wide along its eastern boundary adjoining the beach and ocean. The map also indicates that the lot has a depth of 102.61 feet along one side that borders a street called Maryland Avenue and a depth of 100 feet on the other side.
Plaintiffs' predecessors in title acquired both lot 1 in block 9 and two immediately adjoining interior lots  lots 1 and 13 in block 10  by a single deed dated August 19, 1921 and recorded on January 6, 1922.
Between 1920 and 1923, a total of twenty-four of the sixty-three lots in the subdivision were conveyed to purchasers such as plaintiffs' predecessors in title. Four oceanfront lots were included in those conveyances, *1125 including the conveyance of lot 1 in block 9 to plaintiffs' predecessors.
In 1923, the parties who had subdivided the oceanfront property conveyed all of their remaining property to a single purchaser by an omnibus deed that excluded the lots that already had been conveyed.
Plaintiffs filed this quiet title action in 2002. After a prolonged discovery period, an unsuccessful effort at mediation, and the denial of plaintiffs' motion for summary judgment, the court conducted a two-day bench trial in which testimony was presented by the former Director of Public Works in Point Pleasant, plaintiff John Boylan, and title experts for both parties. In addition, the parties introduced the 1920 subdivision map and the pertinent deeds upon which they base their claims to the disputed area of beach.
The trial court concluded in a written opinion that the boundaries of plaintiffs' property were as shown on the 1920 subdivision map and that plaintiffs have no interest in the land beyond the eastern boundary line of lot 1 in block 9 shown on that map. In reaching this conclusion, the court relied upon the subdivision map and deeds introduced into evidence at trial without mentioning any of the trial testimony. The court subsequently entered final judgment dismissing plaintiffs' complaint.
In construing a deed, the court must undertake to determine the intention of the parties. See S.R.H. Corp. v. Rogers Trailer Park, Inc., 54 N.J. 12, 20, 252 A.2d 713 (1969); Normanoch Ass'n v. Baldasanno, 40 N.J. 113, 125, 190 A.2d 852 (1963). If that intention is not clear on the face of the deed, the court may consider extrinsic evidence to resolve any ambiguity. See Hofer v. Carino, 4 N.J. 244, 250-51, 72 A.2d 335 (1950); Stransky v. Monmouth Council of Girl Scouts, Inc., 393 N.J.Super. 599, 610, 925 A.2d 45 (App.Div. 2007). However, in the absence of extrinsic evidence, the court must determine a dispute concerning title by construing the deed as a whole, without giving disproportionate emphasis to any individual part of the document. See Oldfield v. Stoeco Homes, Inc., 26 N.J. 246, 255-56, 139 A.2d 291 (1958); Union County Indus. Park v. Union County Park Comm'n, 95 N.J.Super. 448, 452-53, 231 A.2d 812 (App.Div. 1967).
Although the court conducted a two-day trial, the parties did not present any extrinsic evidence in the form of testimony by a person familiar with the circumstances of the 1920 subdivision or the 1921 conveyance to plaintiffs' predecessors in title or contemporary newspaper articles or other archival materials that could aid in the interpretation of the subdivision map or deed. Therefore, the determination of the eastern boundary of lot 1 in block 9 must be based solely on interpretation of the map and deed.
As previously indicated, the subdivision map gives precise measurements for the lot lines marking the boundaries of each of the twelve oceanfront lots and depicts their eastern boundaries by a straight line, with an area described to the east as "Beach." The eastern edge of the area described as "Beach" is marked by a wavy line. The word "Beach" is followed by the words "Title to Low Water Mark." Consequently, this wavy line presumably depicted the location of the low water mark when the subdivision map was filed. The map did not show the location of the mean high water mark. Thus, it appears from the face of the subdivision map that lot 1 in block 9, like the other eleven oceanfront lots shown on the map, had fixed boundaries, including a fixed eastern boundary, rather than a boundary extending up to the high water mark.
Plaintiffs' argument that, contrary to what is shown on the subdivision map, the eastern boundary of lot 1 in block 9 *1126 conveyed to their predecessors in title extends up to the high water mark, is based on the 1921 deed. That deed begins by describing the property that is the subject of the conveyance as "Lots Numbers One and Thirteen in Block Ten on a certain map filed in the Ocean County Clerks' Office July 23rd 1920 entitled Point Pleasant N.J. Property 70 acres with Ocean Front[,]" without mentioning lot 1 in block 9. This description by reference to the subdivision map is followed by metes and bounds descriptions of lots 1 and 13 in block 10.
The inclusion of lot 1 in block 9 in the conveyance is set forth at the end of the metes and bounds description of lot 13 in block 10, as follows: "[W]ith so much of Lot No. 1 in Block No. 9 as has not been submerged to high water mark in the Atlantic Ocean be the same what it may." Thus, unlike lots 1 and 13 in block 10, the deed does not include a metes and bounds description of lot 1 in block 9. It describes this lot solely by reference to the lot and block number on the subdivision map. And as previously indicated, that map shows the precise measurements of lot 1 in block 9, including a straight 72.995 foot eastern boundary line adjoining the beach and ocean.
Moreover, the language relied upon by plaintiff appears to limit rather than to expand the boundaries of lot 1 as shown on the subdivision map. It conveys only "so much of Lot 1 in Block 9 as has not been submerged to high water mark" (emphasis added), rather than describing the eastern boundary of this lot as extending up to the high water mark.
Although neither party presented any extrinsic evidence regarding the reason for inclusion of this language in the deed, Point Pleasant's expert hypothesized that lot 1 may have been partially submerged at the time of the conveyance and that the sellers may have added limiting language to the deed to protect themselves against any claim by plaintiffs' predecessors in title that they did not own the entirety of lot 1 in block 9 shown on the subdivision map because it was partially below the mean high water mark and thus owned by the State. See Borough of Wildwood Crest v. Masciarella, 51 N.J. 352, 356-58, 240 A.2d 665 (1968). We of course have no way of knowing whether this was the actual reason the draftsman of the deed inserted such limiting language. However, we are convinced this language cannot reasonably be construed as expressing an intention to convey land beyond the eastern lot line shown on the subdivision map that was then or thereafter might be above the high water mark.
This conclusion is reinforced by the fact that the deeds to the other oceanfront lots did not contain any reference to the mean high water mark, and therefore it is undisputed that the eastern boundaries of those lots are the boundaries shown on the subdivision map. Consequently, if the 1921 deed to plaintiffs' predecessors in title were construed in the manner urged by plaintiffs, lot 1 in block 9 would be the only lot in the subdivision that would extend to the high water line; all of the other lots would extend only to the straight eastern boundary line shown on the subdivision map. It seems highly unlikely that the developers who subdivided this property could have intended the oceanfront lots to have such an uneven configuration.
An additional reason supporting our conclusion that the description of lot 1 in block 9 in the 1921 deed was not intended to establish an eastern boundary line that extends to the high water mark is that the subdivision map indicates that the area beyond the eastern boundaries of the oceanfront lots is "Beach." The subdivision created not only twelve oceanfront lots, including lot 1 in block 9, but also fifty-one interior lots. As we previously *1127 observed with respect to another oceanfront subdivision, "any person acquiring one of those [interior] lots would reasonably have assumed that one of the benefits of property ownership was convenient access to the beach and ocean by means of [the] street network" shown on the subdivision map. Bubis v. Kassin, 323 N.J.Super. 601, 611, 733 A.2d 1232 (App.Div. 1999). A purchaser of an interior lot also would reasonably have assumed that the beach to which they were gaining convenient access was the beach as shown on the subdivision map. However, if the deed to plaintiffs' predecessors in title were construed to convey a title extending up to the high water mark, this would mean that the beach area would not be as extensive as shown on the subdivision map, but rather would include, in the area to the east of lot 1 in block 9, only the part of the beach that is below the high water mark. Therefore, any ambiguity in the description of lot 1 in block 9 contained in the 1921 deed should be resolved by reference to the depiction of this lot in the 1920 subdivision map, which shows it to have the same straight eastern boundary line as the other eleven oceanfront lots.[1]
Finally, we reject plaintiffs' argument that the entire area designated as "Beach" on the subdivision map must be assumed to have been below the high water mark and consequently that the eastern lot lines of the oceanfront lots must have been located at the high water mark. Although "[t]he primary meaning of the word beach is the land between the ordinary high water mark and the low water mark[,]" Bubis, supra, 323 N.J.Super. at 612, 733 A.2d 1232 (quoting Anderson v. DeVries, 326 Mass. 127, 93 N.E.2d 251, 255 (1950)), "the word has, in common parlance, another and well-recognized use in designating that portion of the shore consisting generally of sand and pebbles, resulting usually from the action of the water, as distinct from the `upland,' to which it often extends above normal high-water mark." Borden v. Town of Westport, 112 Conn. 152, 151 A. 512, 515 (1930); see also Waldman v. Town of Barrington, 102 R.I. 14, 227 A.2d 592, 595 (1967). Indeed, in Borough of Spring Lake v. Polak, 76 N.J. Eq. 212, 213-14, 75 A. 753 (Ch. 1909), rev'd on other grounds, 77 N.J. Eq. 557, 78 A. 50 (E. & A.1910), the court noted that on the filed map of Spring Lake, "[t]he strip marked `beach' is the shingle that extends from the `bluff' to the low-water mark and is nearly if not quite covered with water at high tide[,]" thus indicating that part of the area described as "beach" was above the mean water mark. Similarly, we construe the word "Beach" on the 1920 Point Pleasant subdivision map to refer to the entire area *1128 beyond the eastern lot lines of the oceanfront lots, including land both above and below the high water mark. Therefore, we conclude that the eastern boundary of lot 1 in block 9 is the lot line shown on the subdivision map and that the trial court correctly dismissed plaintiffs' complaint.[2]
Affirmed.
NOTES
[1] Although we do not need to decide the issue, we question whether the developer who subdivided the oceanfront property could have conveyed a lot with a different eastern boundary line than that shown in the 1921 subdivision map to plaintiffs' predecessors in title, even if that intent had been clearly expressed in the 1921 deed. It is firmly established in this State that "[w]henever the owner of a tract of land lays it out into blocks and lots upon a map, and on that map designates certain portions of the land to be used as streets, parks, squares, or in other modes of a general nature calculated to give additional value to the lots delineated thereon, and then conveys those lots by reference to the map, he becomes bound to the grantees not to use the portions so devoted to the common advantage otherwise than in the manner indicated." Lennig v. Ocean City Ass'n, 41 N.J. Eq. 406, 408 (E. & A. 1886). "The object of the principle is ... to secure to persons purchasing lots under such circumstances those benefits, the promise of which it is reasonable to infer has induced them to buy portions of a tract laid out on the plan indicated." Id. at 409. Consequently, any attempt by the developer to convey a lot to plaintiffs' predecessor in title that intruded upon the "Beach" shown on the subdivision map may have been ineffective, at least with respect to purchasers of other lots in the subdivision who relied upon the map.
[2] Point Pleasant's claim to the beach rests on both its designation as "Beach" on the subdivision map and a chain of title tracing back to the 1923 omnibus deed. The designation of land on a filed subdivision map for use as a street or other public purpose such as, in this case, a beach, constitutes a dedication to public use, which a municipality may accept at any time, and also confers private rights upon purchasers of lots in the subdivision who rely upon that designation. See Highway Holding Co. v. Yara Eng'g Corp., 22 N.J. 119, 125-36, 123 A.2d 511 (1956); Lennig, supra, 41 N.J. Eq. at 408-10, 5 A. 579; Bubis, supra, 323 N.J.Super. at 609-12, 733 A.2d 1232. Point Pleasant did not file a counterclaim to quiet title to the area of beach adjoining lot 1 in block 9. Therefore, there is no need to decide the nature of Point Pleasant's interest in that beach area or the existence of implied private rights of access to the beach by the owners of lots in the 1920 subdivision.