S. R. H. CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ROGERS TRAILER PARK, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued January 6, 1969—Decided May 5, 1969.

*Mr. Samuel J. Davidson* argued the cause for respondent (*Mr. Myles Daitzman* on the brief).

*Mr. Paul T. Huckin* argued the cause for appellant (*Mr. Charles L. Bertini,* attorney; *Messrs. Huckin & Huckin* of counsel and on the brief).

The opinion of the court was delivered by

HANEMAN, J.   Plaintiff recovered a judgment for rent in the Law Division. Upon defendant's appeal, the Appellate Division affirmed in an unreported opinion. This Court granted certification upon defendant's petition. 52 *N. J.* 487 (1968).

Defendant owns and operates a park for house trailers in the Borough of Moonachie on lands designated Plot 1 in Block 132 on the municipal tax map. In 1962, before taking title to adjacent lands, *i. e.,* Plot 1 in Block 134, plaintiff obtained a survey which showed that defendant had parked an unspecified number of trailers over its easterly line on property plaintiff was about to acquire. After several conferences, the parties signed the following letter:

"S. R. H. Corporation                                    February 27, 1962
Att: Mr. Philip Pollock
Gentlemen:
    Upon your taking title to the property adjacent to our trailer camp we hereby agree to rent space for our trailers at the rate of twenty five dollars per month, per trailer. This rental shall be on a month to month basis, payable in advance.
    This tenancy can be terminated by the tenant at the end of any month, and can be terminated by the landlord upon sixty days written notice.
    At the present time there are six trailers on your property, in the event that more or less trailers are situated on your property we shall pay more or less rent as the case may be."

Plaintiff alleges that on February 27, 1962, not six but fourteen house trailers occupied a part of its land, and seeks recovery of rent under said agreement, for the additional eight trailers. It bottoms this claim of additional encroachments on a 1965 survey made by Florio C. Job. Defendant denies any liability under the agreement and additionally disputes the accuracy of the 1965 survey. At the trial, the location of the dividing line between plaintiff's and defendant's lands became the initial primary issue, and the liability under the agreement the secondary issue, as the question of any liability of defendant rests upon its parking trailers east of that line.

As above noted, the jury returned a verdict for plaintiff. Defendant advances a number of grounds for reversal. We shall discuss one of said grounds in which we find merit, *i. e.*, the trial judge erred in refusing to permit two of defendant's witnesses to testify. This conclusion makes unnecessary the consideration of the merits of other grounds advanced by defendant. Before treating of defendant's above noted objection to the trial judge's ruling concerning defendant's said witnesses, we shall advert to the factual complex, as we view it, and the legal issues which undergird this litigation.

■ It must be remembered, in seeking to resolve the basic issue, *i. e.*, the location of the dividing line between plaintiff's and defendant's lands, that the respective titles originated from judgments obtained by the Borough of Moonachie in the foreclosures of two tax sale certificates, one covering Plot 1 in Block 132, and the other covering Plot 1 in Block 134. The titles thus obtained are new and complete, under an independent grant which bars or extinguishes all prior title and encumbrances of private persons, provided of course a foreclosure had been properly undertaken and completed and the necessary parties in interest joined as defendants. In the language of then Judge Jayne in *Metropolitan Life Ins. Co. v. McGurk,* 15 *N. J. Misc.* 572, 193 *A.* 696 (*Atl. Cty. Cir. Ct.* 1937), affirmed 119 *N. J. L.* 517 (*E. & A.* 1937):

"A tax title is assuredly in the nature of a new and independent grant from the sovereign authority. But it is to be realized that the tax title is established upon the assessment. In the quantity and character of the property conveyed, the tax sale embraces nothing more or different than did the basic assessment. The property actually asssessed and the property conveyed by the tax sale must be the same." at *p.* 574.

It follows that the municipality obtained title only to those lands upon which the assessment was levied and upon which a lien was thereby created. It is that lien on those lands

which was foreclosed and from which arose plaintiff's and defendant's titles. In order to ascertain what those lands were, reference must be had to the descriptions contained in the assessment rolls, tax sale certificates, and foreclosure proceedings. In that connection the record discloses the following:

In 1928, the Borough of Moonachie adopted an official assessment map, (see *L*. 1913, *c*. 175, as amended, 1924 *Supp. Compiled Statutes* §§ 208–444(d) through 444(i), saved from repeal by *N. J. S. A.* 54:1–15). Shown upon this map was Plot 1 in Block 132 (now owned by defendant), and adjacent thereto Plot 1 in Block 134 (a portion thereof now owned by plaintiff), both bordering on Moonachie Avenue.

The plotting of Plot 1 in Block 132 shows definite distances on all of its sides. The delineation of Plot 1 in Block 134 shows a definite distance for the boundary with defendant's property, but only an approximate ($\pm$) distance for the Moonachie Avenue boundary. The dividing line between the two lots in addition to figures designating its length contains the legend "CL proposed street" (center line of proposed street). This "center line" running in a general north-south direction, and lying south of Moonachie Avenue, terminates on said map at the intersection of the center line of Moonachie Avenue and the extended center line of Redneck Avenue, Redneck Avenue is an existing street which intersects the northerly line of Moonachie Avenue. Although there are no courses shown on the assessment map, the distances in the plotting of Plot 1 in Block 132 are identical with the distances recited in a deed from Herman Foth and wife to Annie Sealske, who had been the continuous owner in fee from 1908 until the final judgment in the tax foreclosure hereafter mentioned. At the time of the conveyance in 1908, Foth was the owner of a larger tract which included Lot 1 in Block 134. The conveyance to Sealske contained the first reference in the title to a "proposed street." The deed provided: "Subject to the right of way

of said proposed street to the said party of the first part their heirs and assigns."

Taxes which were assessed against lands designated on the tax rolls as "Plot 1 in Block 132", as shown on said assessment map, for the year 1929, not having been paid, the lands were sold to the Borough on October 10, 1931. The tax sale certificate which was issued to the municipality described said lands as "Plot 1 in Block 132." The Borough foreclosed the tax sale certificate in 1944, describing the lands in the bill to foreclose and the final decree, as follows:

"Beginning at a point in the center of the Public Road leading from Moonachie to Woodridge, which said point is the most Northerly corner of the Tract hereby intended to be described, from thence running (1) South 48 deg., 45 min. West 217.5 feet to a point; thence (2) North 54 deg., 30 min. West 75.06 feet to a point; thence (3) South 45 deg. West 649.25 feet to a point; thence (4) South 45 deg., East 554.14 feet *to a point in the center of a proposed Street;* thence (5) North 45 deg., East 812.97 feet *through the center of said proposed Street to the Center of said first mentioned* Road leading from Moonachie to Woodridge; and thence (6) North 37 deg. West, 469.96 feet, along the center line of said Road, to the point or place of beginning.

CONTAINING 10.41 Acres, was, in the year 1929, assessed as Plot 1 in Block 132 on the tax duplicate of the said municipality." (Emphasis supplied)

The courses, distances and calls for the "center of a proposed street" are in the identical language of the Foth-Sealske deed. On December 21, 1944, the Borough of Moonachie sold and conveyed Plot 1 in Block 132 to Ange Dell, defendant's predecessor in title, by that Plot and Block designation and by the identical metes and bounds description contained in the bill to foreclose. Title eventually vested in defendant by *mesne* deeds describing the property in the same manner.

Taxes which were assessed against lands which were designated on the tax rolls as "Plot 1 in Block 134" not having been paid, the lands were sold to the Borough of Moonachie on October 30, 1934. The tax sale certificate issued to the

municipality described said lands as "Plot 1 in Block 134." The Borough foreclosed the tax sale certificate in 1952 by an *in rem* proceeding, *N. J. S. A.* 54:5–104..29, *et seq.,* describing the lands in the complaint as "land shown on the Tax Map of the Borough of Moonachie as Block 134, Lot. No. 1." The final judgment described said lands as "Block 134, Plot No. 1 as shown on the 1928 Assessment Map of the Borough of Moonachie." The Borough conveyed the entire Plot 1 in Block 134 to Rand Realty Corp., plaintiff's predecessor in title. On February 3, 1962 plaintiff obtained title to the lands here involved by a conveyance which described said lands by metes and bounds descriptions and referred to said lands as "a portion of Lot No. 1 in Block 134 as shown on the Assessment Map of the Borough of Moonachie." This description did not allude to the western boundary (which is the eastern boundary of Lot 1 in Block 132), as the center line of a proposed street.

The foregoing appears reasonably clear from the record. However, the balance of plaintiff's proof seeking to locate the dividing line between the properties, is not only not clear but is frustratingly confusing. The fencing between plaintiff's engineer and defendant's counsel served only to obfuscate the question further and gave rise to the rulings on evidence to which defendant objects. In passing it should be noted that the many testimonial references to the surveys introduced as exhibits and the location thereon of various lines, monuments, streets, etc., on both direct and cross examination, were far from satisfactory. In practically no instance was any identifying mark made on the map then being discussed to show what was referred to by the question and answer. Generally, the interrogation and reply consisted in such oral statements as "this line" or "that street," etc. It must be self-evident that upon appeal it is almost impossible, without an identifying sign on an exhibit, for the reviewing court to ascertain to what counsel or witness were referring. There is grave doubt that the jury could retain any clear recollection of what the questions and answers

contemplated upon its retirement for deliberation. Largely as a result of said deficiencies, it is most difficult to ascertain from plaintiff's engineer's testimony, how he located the dividing line between the lots. Upon a retrial as hereafter ordered, this deficiency in the trial should be supplied.

Although plaintiff's engineer, Mr. Job, would not specifically admit that his survey moved the location of the dividing line between plaintiff's and defendant's lands from that shown on the assessment map, he did on a number of occasions classify the assessment map as "inaccurate" in showing the location thereof and his map as accurate in that connection. He appears to base this conclusion on his statement that in 1948 or 1949 he discovered that Redneck Avenue was erroneously located on the assessment map. Since the extended center line of the proposed street is shown on that map as terminating in the extended center line of Redneck Avenue, and since he states that the true location of Redneck Avenue is west of that shown on the map, he apparently concludes that the Moonachie Avenue terminus of the boundary in question must also be west of that location shown on the assessment map. Although he did not articulate it in such terms, plaintiff's engineer seems to assume that the center line of the proposed street and the center line of Redneck Avenue being "monuments," their correct location must prevail over the distances delineated on the map. Underlying this reasoning is the presumption that the proposed street was intended as an extension of Redneck Avenue. No factual basis for this conclusion is given.

The reason for and limitations of this rule have been aptly stated in 6 *Thompson, Real Property* (1962 *Replacement*) § 3044, *pp.* 571-576:

"A 'monument' is a tangible landmark, and monuments, as a general rule, prevail over courses and distances for the purpose of determining the location of a boundary, even though this means either the shortening or lengthening of distance, unless the result would be absurd and one clearly not intended, or all the facts and

circumstances show that the call for course and distance is more reliable than the call for monuments. * * * This rule does not apply when it is evident that the call for a natural object or established boundary line was made under a mistaken belief with reference to the survey.

These preferences are merely constructional preferences and will yield to the manifest intent of the grantor if this can be ascertained. * * * * * * * *

* * * Generally, in determining boundaries, natural and permanent monuments are the most satisfactory evidence and control all other means of description, in the absence of which the following calls are resorted to, and generally in the order stated: First, natural boundaries; second, artificial marks; third, adjacent boundaries; fourth, course and distance, course controlling distance, or distance course, according to circumstances. * * *"

See also *Schroeder v. Engroff*, 57 *N. J. Super.* 452 (*App. Div.* 1959), reversed on other grounds, 33 *N. J.* 204 (1960); *Hofer v. Carino*, 4 *N. J.* 244 (1950); 11 *C. J. S. Boundaries* §§ 50, 51; 12 *Am. Jur. 2d, Boundaries*, §§ 4, 65, 67. Public streets or roads may be used as artificial monuments, but as they are themselves required to be definitely located, they cannot be given controlling effect over distances and courses unless so located. See *Roosevelt v. Shapiro*, 85 *N. J. L.* 626 (*E. & A.* 1913); *Hofer v. Carino, supra; Broadsword v. Kauer*, 161 *Ohio St.* 524, 120 *N. E. 2d* 111 (*Sup. Ct.* 1954).

It is clear then that the proposed street cannot of itself be considered a landmark and there is nothing in the record to tie its location to that of Redneck Avenue. In attempting to correct the allegedly erroneous location of the supposed landmark, Job apparently moved the northerly terminus of the contested boundary westward of the location shown on the assessment map. This resulted in the creation of a new common boundary line west of that shown on the assessment map; a reduction of the length of the side of defendant's lands bordering Moonachie Avenue; and a change in the length of the common boundary line. The effect of this reduction and change is the creation of a triangle bounded by the newly located dividing line, the dividing line as shown on the assessment map, and the strip of Moonachie Avenue by which defendant's frontage is reduced. By this triangle,

although he does not admit that he does, he excludes from Plot 1 in Block 132 and adds to Plot 1 in Block 134. The survey which Job ran and protracted on a map, shows trailers in relation to this new dividing line and does not show the dividing line as portrayed on the assessment map.

If the foregoing is a correct exposition of the manner in which Job located the dividing line, he is confronted not only with the undisclosed answer to the question of how and by whom the proposed street was created and located, but also and more importantly, with the impropriety of, in any event, attacking its location on the assessment map. It must be remembered that this is a contest between the two successors to the municipal title and not between the original owners of the fee in Plot 1 in Block 132 and Plot 1 in Block 134. The owner, at the time of foreclosure of Plot 1 in Block 134, might perhaps be in a position to contest the validity of a judgment in foreclosure which allegedly terminated his interest in lands west of the proposed street, for failure of the municipality to join him as a defendant in the foreclosure proceedings of Plot 1 in Block 132, or for failure to include that additional land in the foreclosure proceedings of Plot 1 in Block 134. Here, however, neither plaintiff nor defendant can contest the accuracy of the plotting of lots on the assessment map because the tax liens which undergird their titles resulted from taxes levied against the lands as thereon shown. The extent of their lands is conclusively limited to the boundaries as shown on the assessment map. Plaintiff is therefore restricted on its western boundary to the dividing line as shown on that map and any recovery by plaintiff must be bottomed on a survey showing trailers parked east of that line.

With the above factual and legal statements we turn to defendant's argument that the trial court committed reversible error in refusing to allow its experts to testify. David Cascino, an engineer, was called, but the court sustained plaintiff's objection to his testimony because his name was not set forth in answer to an interrogatory asking:

"What are the names and addresses of all persons whom you believe have any information or knowledge of any fact with respect to the allegations contained in the Complaint and Answer, specifying with particularity what knowledge or information you attribute to such person?"

Defendant then offered to call Emil E. Kusala, a title officer, but the same objection was made and sustained. It was defendant's position that the two were experts whose testimony would be limited to opinion evidence and that the question did not apply to such experts. While he made no proffer of their testimony at trial, we have allowed him to furnish us that information. We find that the witnesses would have given opinion as distinguished from factual testimony, and that the interrogatory did not call for disclosure of the names and testimony of experts. Therefore the court committed reversible error in sustaining the objections. *Cermak v. Hertz Corp.*, 53 *N. J. Super.* 455, 464 (*App. Div.* 1958), affirmed 28 *N. J.* 568 (1959); *Gibilterra v. Rosemawr Homes, Inc.*, 19 *N. J.* 166, 173 (1955). See also *R. R.* 4:16–4.

The above recital of the factual complex and legal problems points up the vital nature of the testimony of defendant's barred engineering and title experts. Without their testimony, the matter was submitted on the testimony of plaintiff's expert alone. By refusing to permit them to testify, defendant was denied the opportunity of producing any contradictory or pertinent testimony on the location of the dividing line. This constitutes reversible error and requires a reversal and retrial. In the light of our conclusion to remand for retrial, plaintiff will have ample opportunity before retrial to explore the qualifications of defendant's experts and to pursue such other pretrial discovery as may be necessary and proper, and, if felt necessary, to obtain more experts of its own. Defendant, on the other hand, may and should be prepared to adduce affirmative factual proof of the location of the trailers in relation to the division line

as shown on the assessment map and not limit the thrust of its trial to an attack on Job.

For further guidance on retrial, several other subjects arising out of the construction of the above letter agreement, require some discussion. By way of defense, defendant asserts that the letter constituted a compromise and settlement of the question of the number of trailers located on plaintiff's lands on February 27, 1962. Defendant states that the parties agreed to accept the figure six as finally conclusive. Accordingly, it argues that the last paragraph which reads

"At the present time there are six trailers on your property, in the event that more or less trailers are situated on your property we shall pay more or less rent as the case may be."

clearly refers to additional trailers that may be added to or removed from plaintiff's lands subsequent to February 27, 1962.

Plaintiff argues *contra,* that the above quoted paragraph provides for a tentative estimate of the number of trailers situated on its land and for additional rental if it is discovered after February 27, 1962 that there were then more than six trailers so situated. The parties have stipulated that with the possible exception of the removal of two trailers, the number on defendant's lands remained static from the date of the letter to the trial of the case.

The problem, therefore, reduces itself to a determination of whether the parties intended that defendant pay additional rent if it was discovered subsequent to February 27, 1962, that there were more than six trailers parked on defendant's lands on that date. To that end, we suggest that the trial court should liberally admit evidence in aid of the construction of the contract. This involves, of course, the elucidation of the terms of the alleged compromise and settlement. Related to the foregoing, in the event the above query is answered in the affirmative, is the question of how soon after February 27, 1962, demand should be made for additional

rental. The agreement does not contemplate that verification could be made and action taken by defendant at any time in the future. Implicit in the agreement is the proviso that verification of the number stated therein and possible demand for an excess over six, should be made within a reasonable time after that date. The question therefore is, was plaintiff's demand made within a reasonable time?

Whether these problems should be resolved by the court or jury depends upon the evidence adduced at the trial. In *Michaels v. Brookchester, Inc.*, 26 *N. J.* 379 (1958), this Court said:

"Ordinarily the construction of a written agreement is a matter for the court, but where its meaning is uncertain or ambiguous and depends upon parol evidence admitted in aid of interpretation, the meaning of the doubtful provisions should be left to the jury. *Newark Publishers' Ass'n v. Newark Typographical Union*, 22 *N. J.* 419, 427 (1956) ; *Spinelli v. Golda*, 6 *N. J.* 68, 79 (1950) ; *Jennings v. Pinto*, 5 *N. J.* 562, 570 (1950) ; 3 *Williston, Contracts (Rev. Ed.* 1936), § 616, *p.* 1772." at *p.* 387.

In the event these issues are required to be resolved by a jury, their nature requires additionally, a full and lucid charge along the above sketched lines.

Reversed and remanded for retrial.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN. — 7.

*For affirmance* — None.